MONIQUE C. WINKLER (Cal. Bar No. 213031)
BERNARD B. SMYTH (Cal. Bar No. 217741)
  SmythB@sec.gov
TRACY L. DAVIS (Cal. Bar No. 184129)
  DavisTL@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| MANUEL A. ROMERO, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY OF THE ACTION**

1. From at least October 2016 through May 2020 (the "relevant period"), Manuel A. Romero, the former controller and chief financial officer of Professional Financial Investors, Inc. ("PFI"), a real estate investment and management company in Marin County, California, falsified financial statements provided to investors and made fraudulent cash transfers as part of a larger Ponzi-like scheme designed and operated by PFI's now-deceased founder and its former president. In order to improve the appearance of the financial condition of certain PFI controlled

entities for investors, Romero oversaw fraudulently inflated cash reserves and manipulated various expense line items. Over the relevant period, Romero also played a key role in carrying out the Ponzi scheme by commingling funds across the various PFI entities' bank accounts and making distributions to existing investors from new investor funds.

2. PFI marketed its investments to clients as safe alternatives to the stock market that were secured by real estate and large cash reserves which would yield regular returns. However, unbeknownst to PFI's investors, PFI's now-deceased founder Kenneth Casey and its former president Lewis Wallach collectively misappropriated more than $35 million from investors as part of a larger fraudulent scheme in which hundreds of millions of dollars were raised from more than 1,300 investors. Many of the defrauded investors were elderly, retired and relying on their investment income for daily living expenses.

3. Casey also approved loans from PFI to Romero of approximately $229,000 that were taken from PFI investor funds and never disclosed to investors. Romero repaid a portion of the loans, but still owes PFI and its investors $91,819.

4. The fraudulent scheme began to unravel shortly after Casey's death on May 6, 2020, when a review of PFI's financial records revealed questions about the short-term solvency and historical operations of the company and its related entities. PFI is currently in Chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of California, leaving thousands of investors with hundreds of millions of dollars in potential losses.

5. Defendant Romero has violated, and unless restrained and enjoined will continue to violate, the antifraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. The Commission seeks an injunction against Romero from future violations of these provisions, as well as disgorgement of ill-gotten gains, prejudgment interest on disgorgement, civil money penalties, and an officer and director bar.

**JURISDICTION AND VENUE**

6. The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

8. Defendant Romero, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

9. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. Defendant Romero falsified PFI's financial statements in this District, PFI investors reside in this District, and offers and sales of PFI securities took place in this District.

10. Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco Division, because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in Marin County.

**DEFENDANT**

11. **Manuel Romero**, age 55, resides in Marin, California. Romero joined PFI as an accountant in 2006 and became Controller in 2015. He was appointed Chief Financial Officer in 2018, the position he held until his termination in June 2020. Romero has never been licensed as a CPA, but has a two-year accounting degree issued by an educational institution in Nicaragua. Romero invested in securities issued by Professional Investors Security Fund, Inc., an entity affiliated with PFI.

# RELATED ENTITIES

12. **Professional Financial Investors, Inc.** is a California corporation based in Novato, California that was founded by Kenneth Casey in 1990. PFI is a real estate investment and management firm specializing in multi-unit residential and commercial real estate in Northern California. On July 26, 2020, PFI filed a voluntary Chapter 11 bankruptcy petition in the Bankruptcy Court for the Northern District of California.

13. **Professional Investors Security Fund, Inc.** ("PISF" and, together with PFI, the "Companies") is a California corporation based in Novato, California that was founded by Kenneth Casey in 1983. PISF is a real estate investment and management firm that serves as limited partner for 10 real properties in Northern California. PFI is the general partner for each of the 10 real properties for which PISF serves as limited partner. On July 16, 2020, a group of PISF investors filed an involuntary Chapter 11 bankruptcy petition against PISF in Bankruptcy Court for the Northern District of California.

# FACTUAL ALLEGATIONS

**A.    Background of PFI and PISF and the Securities Offered and Sold**

14. PISF was founded in 1983 and PFI was founded in 1990 by Casey, who died on May 6, 2020. Both companies were founded as real estate investment and management firms specializing in multi-unit residential and commercial properties in Northern California.

15. Casey served as the sole director, officer and shareholder of PFI until 1998, when he relinquished his corporate positions and Lewis Wallach took over as president of PFI. Despite relinquishing his corporate positions, Casey continued to exert significant control over PFI until his death. Wallach continued to serve as president of PFI until June 2020, when he was forced to resign because of his role in the fraudulent scheme.

16. Together, PFI and PISF own a direct or indirect interest in approximately 70 residential and commercial real properties in California, including equity interests in limited liability companies (together, the "LLCs") that hold either fee title or an interest as tenant-in-

common in various real properties and general partner interests in limited partnerships (together, the "LPs") that hold fee title to various real properties in California.

17. Since at least October 2016 through May 2020, at the direction of Casey and Wallach, PFI and PISF raised funds from investors through the offer and sale of at least three different types of securities: a) promissory notes issued by PISF and secured by PISF's interests in the LPs (the "Straight Notes"); b) promissory notes issued by PISF or PFI and secured by junior deeds of trust on real properties owned by the LPs or PFI (the "DOT Notes"); and c) membership interests in various LLCs.

18. Casey and Wallach told investors that the interest payments and equity distributions for all of the securities offered and sold by PFI and PISF were to be made based on the income generated by PFI's management of the underlying real property, including collection of rents from tenants.

**B.    Romero's Role in the Fraudulent Scheme**

19. From at least June 2011 to May 2020, through Casey and Wallach, PFI and PISF raised hundreds of millions of dollars from more than 1,300 investors through the offer and sale of the securities described above. A significant portion of those investors are elderly and invested IRA or other retirement funds. Many investors relied on investment returns to pay their daily living expenses. Romero understood that Casey and Wallach offered and sold PFI and PISF securities to numerous investors and was familiar with the various investment structures they offered.

20. As Romero knew, Casey and Wallach provided investors with investment documentation and, for certain of the investment types, financial statements. They also made verbal representations regarding the securities to both prospective and existing investors. While soliciting investments for PFI and PISF, Casey and Wallach made numerous false and misleading statements. Romero participated in preparing some of the false and misleading statements and undertook deceptive acts in furtherance of others.

21. Casey and Wallach falsely told investors in each of the categories of securities offered by PFI and PISF that their monies would be primarily used to purchase real property and make improvements to real property already owned by PFI or PISF. Contrary to the Companies' representations, a substantial portion of investor funds were used in a Ponzi-like fashion to pay back previous investors or to cover operating losses at PFI and PISF. For example, between September 2015 and May 2020 – a period in which PFI and PISF raised approximately $330 million from investors – over $150 million was used to pay interest to prior investors, pay certain investors principal, and cover the operating losses of PFI and PISF.

22. Between June 2011 and May 2020, through Casey and Wallach, the Companies also misrepresented the safety and liquidity of the securities offered and sold by PFI and PISF, falsely telling investors that their investments were liquid and could be cashed out at any time, with as little as a few days' notice, and that PFI and PISF maintained substantial reserve funds for that purpose. Contrary to their representations, PFI and PISF lacked adequate cash from operations to meet their obligations without bringing in new investor funds, let alone cash sufficient to provide liquidity to investors seeking to withdraw their investments on short notice.

23. Romero's conduct contributed to the scheme in two critical ways. First, he supervised and approved daily cash transfers between bank accounts for the various entities, which he knew had the effect of commingling investor funds across unrelated properties and which effectuated the Ponzi-like payments to existing investors from previous investor funds. Second, he supervised and directed the preparation of quarterly financial statements that he knew were falsified in material respects before being disseminated to investors.

24. With respect to the account transfers, on a daily basis, Romero oversaw a process that involved his team reviewing cash balances across the bank accounts for each of the separate real estate property entities managed by the Companies. Romero would then authorize transfers where needed to cover cash shortfalls or to facilitate interest or capital redemption payments to investors. Romero understood that transferring funds between unrelated entities, which effectively commingled investor funds across all of the Companies' properties, was contrary to

the Companies' representations to investors that money invested in a particular property would be utilized only to purchase, improve and operate the property associated with the securities purchased by the investor – not to pay returns to investors who purchased securities related to a different property or for operating expenses related to other properties. Romero understood this because Casey told him that direct transfers between certain accounts were not allowed by the investor disclosures, but that they could achieve the same result by funneling cash through specific intermediary accounts. He also knew this because he was a PISF investor and received the same disclosures from Casey and Wallach that other investors did.

25. Romero also played a key role in the preparation of falsified quarterly financial statements sent to PFI LLC investors. Specifically, Romero supervised the preparation and distribution of falsified financial statements that he understood were provided to investors. At the direction of Casey, Romero regularly – either directly or through instructions given to his direct reports – altered the quarterly financial statements in a manner that materially overstated the amounts of cash that the PFI LLCs held and obscured amounts owed to the PFI LLCs by other entities (as a result of the cash transfers described above). Romero also instructed his team to arbitrarily capitalize certain general operating expenses to present a rosier picture of operating results than accurate financial statements would have reflected.

26. From at least as early as the fourth quarter of 2016, and on a quarterly basis thereafter until his departure in June of 2020, Romero participated in creating and communicating to investors cash balances that were overstated by hundreds of thousands of dollars each quarter. As Romero knew, these manipulated cash balances concealed from PFI investors the fact that cash they had invested – and that was intended for building improvements – had instead been siphoned off for other purposes unrelated to their single-property investment vehicles. For example, in early 2019 investors in one property were provided with financial statements indicating cash balances of over $300,000 when the internal financial system overseen by Romero indicated that the cash balance was only $52,000.

27. During that same period of time, Romero participated in regular efforts to manipulate periodic financial results of various investment vehicles that were ultimately distributed to investors. Romero created journal entries in the Companies' books and records to remove the impact of ordinary maintenance, janitorial services and other expenses in an effort to convey to investors that their investment properties were achieving more successful operating results than they in fact were. For example, for the year-ended December 2018, Romero eliminated over $500,000 of ordinary expenses – such as landscaping and janitorial services – from various investment properties, through unsupported journal entries, to inflate their operating results.

28. Romero knew that there was no legitimate basis for the changes he instructed his direct reports to make to the financial statements, and that the alterations made were done to improve the appearance of the financial condition of PFI and its related entities to investors.

### C.  Romero's Receipt of Undisclosed Loans From Investor Funds

29. Over the relevant period, Romero also received various loans from PFI for personal expenses, including to make down payments on his primary residence in Marin, to purchase a second residence in Nicaragua, and to pay off credit card bills.

30. Although Casey authorized the loans, Romero knew or was reckless in not knowing that the money for those loans came from investor funds and had not been disclosed to investors.

31. In total, Romero borrowed $229,000 from PFI over the relevant period. Although he made some efforts to repay the loans, $91,819 remains outstanding.

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5*

32. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 31.

33. By engaging in the conduct described above, Defendant Romero, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

    (a)    Employed devices, schemes, or artifices to defraud;

    (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    (c)    Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

34. By reason of the foregoing, Defendant Romero violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

*Violations of Sections 17(a)(1), (2), and (3) of the Securities Act*

35. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 31.

36. By engaging in the conduct described above, Defendant Romero, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

    (1)    with scienter, employed devices, schemes, or artifices to defraud;

    (2)    obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (3)    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

37. By reason of the foregoing, Defendant Romero violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

**I.**

Permanently enjoin Defendant Romero from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**II.**

Issue an order requiring Defendant Romero to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this complaint, together with prejudgment interest thereon.

**III.**

Issue an order requiring Defendant Romero to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**IV.**

Prohibit Defendant Romero from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: March 31, 2022            Respectfully submitted,

*/s/ Bernard B. Smyth*
BERNARD B. SMYTH
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION